*963 GREMILLION, Judge,
dissenting.
The majority opinion chooses to answer only one of two relevant questions here. That question is whether the legislature intended to revive claims that died by virtue of abandonment between August 26, 2005 and July 9, 2007. Respectfully, it is my position that the majority incorrectly answered that threshold question. In so doing, it leaves the second, and much more important question unanswered: Can the legislature revive those dead and abandoned claims? I will address both questions, in turn.
LEGISLATIVE INTENT
When Hurricane Katrina entered the Gulf of Mexico at 5:00 a.m. on August 26, 2005, it brought with it a level of chaos, destruction, and misery that Louisiana had never seen before. It resulted in the death of 2,057 people[1] and 81.2 billion dollars in storm damage.[2] When Hurricane Rita hit just a few days later, it increased the combined economic losses for both hurricanes to well over 90 billion dollars.[3] By comparison, the great San Francisco earthquake of 1906 killed 700.[4] Following the |¾1992 landfall of Hurricane Andrew, 40.7 billion dollars worth of damages ensued.[5]
For purposes of this analysis, it is important to note that all of the aforementioned death and destruction occurred in the days, weeks, and months that followed August 26, 2005. None of it occurred in the days, weeks, and months that followed July 9, 2007. It is for that reason that I am persuaded by the rationale provided by former Chief Justice Calogero in Harris v. Stogner, 07-1451 (La.1/11/08), 972 So.2d 326. Therein he stated that “[f]rom a practical and logical point of view [the operative language of the amendment in question] must have been intended by the Legislature to refer to actions not abandoned prior to August 26, 2005. No other interpretation of the amendment is reasonable.” Id. at 327. Justice Calogero went on to state that using the 2007 effective date of the amendment “would essentially cancel the exact benefits the amendment was adopted to address.” Id.
Thus, I respectfully disagree with the view of the majority. The legislature clearly and unequivocally intended that the amendment be given retroactive effect to those cases in which the three-year period had not run on August 26, 2005. No other interpretation of the amendment is reasonable.
LEGISLATIVE AUTHORITY
Had the majority concluded that the legislature did, in fact, intend to revive a class of claims abandoned between August 26, 2005 and July 9, 2007, they would have had to address the far more challenging *964 question of whether our legislature actually has the power to do such a thing. The current State of Louisiana jurisprudence answers that question with an unequivocal “no.” Estate of Williams v. Louisiana Office of Risk Management, 93-3944 (La.App. 3 Cir. 3/30/94), 634 So.2d 260, writ denied, 94-0793 (La.5/6/94), 637 So.2d 1054, and Southern Silica of Louisiana, Inc. v. Louisiana Insurance Guaranty Association, 07-1680 (La.4/8/08), 979 So.2d 460.
I submit, however, that the current State of Louisiana’s law in this area exists precisely because the ruination caused by Hurricanes Katrina and Rita is unique in our history. Such destruction and upheaval have been seen before in other parts of our country. In places where such misery has previously been wrought, the law is different. In those places, “[t]he law seems fairly well-settled that the legislature may under certain circumstances, enact a Statute of Limitations which has the effect of reviving a cause of action barred under a previously applicable Standard of Limitations.” Hintz v. State Tax Commission, 55 Misc.2nd 474, 285 N.Y.S.2d 482, 485 (1966). Historical examples of calamities that rival Katrina/Rita are few, but they are unforgettable.
A WORLD WAR
After World War II, the New York State legislature determined that it was unjust to allow a statute of limitations to toll against a plaintiff when that plaintiffs failure to prosecute his claim resulted from hardships related to the war. In Gallewski v. H. Hentz & Co., 301 N.Y. 164, 93 N.E.2nd 620 (1950), the injured party was arrested and deported to a concentration camp in Czechoslovakia, then occupied by the German army, and there detained. He was never heard from again. In Von Hofmannsthal v. Wolfe, 276 A.D. 223, 93 N.Y.S.2d 550 (1949), the aggrieved party spent the war in Austria, which was also occupied by the German army. The statute of limitations ran on both of these claims during or shortly after the war which officially ended on May 8, 1945.
Though these claims were both dead, the New York legislature revived them by statutory amendments made in 1948 and 1949. Even back then, New York’s Lhighest court acknowledged that “most states hold that it is beyond the power of the legislature to revive causes of action after the limitation period has expired.” Gallewski, 301 N.Y. 164, 171, 93 N.E.2d 620, 623. However, it relied on even older case law to conclude that “ ‘this rule is not absolute and does not invalidate legislation lifting the bar where the circumstances are such as to indicate the presence of a strong moral obligation to do so.’ ” Id. citing Huffman v. Alderson’s Administrator, 9 W.Va. 616.
Thus, the high court concluded that “World War II was an upheaval of unparalleled magnitude.” Id. at 174, 674. Accordingly, “[t]o permit the Statute of Limitations to run against their claims during the continuance of such inability would not accord with elementary notions of justice and fairness.” Id. at 175, 625.
A GREAT DEPRESSION
The value of the property owned by many Americans plummeted in the Depression. Even worse: many of those same Americans lost their ability to pay their mortgages. Consequently, banks stepped in to assert their contractual rights to sell off the deeply undervalued properties in foreclosure sales.
The Minnesota legislature passed a law that extended the “period of redemption” from these foreclosure sales. The United States Supreme Court considered the question of whether this new Minnesota *965 law could be enforced in Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). Though the Supreme Court clearly recognized what it called the “constitutional prohibition” against a state stripping a party of its rights under a contract, it went on to find as follows:
It cannot be maintained that the constitutional prohibition should be so construed as to prevent limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake.
| SM at 439.
Interestingly, the Blaisdell Court an-nunciated a five-part test of the permissibility of the emergency exercise of legislative power. Those five criteria can be boiled down to two. First, the emergency giving rise to the police power must be extreme, and second, the legislative fix must be reasonable, narrowly-tailored, and temporary. Id. The Louisiana legislature’s temporary extension of the abandonment period from three years to five years is limited to only those cases where a Katrina/Rita related hardship can be proven. It also has a “sunset provision” of precisely five years after the legislature intended it to take effect. Consequently, it meets with the requirements of the Blaisdell test.
A CIVIL WAR
Plaintiffs found it difficult to prosecute their cases during the American Civil War. As a consequence, the West Virginia legislature allowed these aggrieved plaintiffs to take an “oath” stating exactly how long they had been obstructed by war, insurrection, or rebellion. Then, the time during which such obstruction continued was not to be computed in determining when the matter would be time-barred. The supreme court of that state not only ruled that the statute was valid, but that it applied both to suits pending and to suits brought after its passage. Huffman v. Alderson’s Admin., 9 W.Va. 616 (W.Va.1876). Thus, the amendment was said to be retroactive and was used to revive dead claims.
CONCLUSION
There is no question that the legislature enacted a statute that was intended to actually help Katrina and Rita victims. The question should not even be whether Louisiana has ever allowed its legislature to revive time-barred claims. Clearly,- it never before has done so. Rather, the real question that the majority should have | ^answered is whether the misery wrought by Katrina/Rita rises to the level of a World War or a Great Depression or a Civil War. Because the answer is “yes,” the statute should be given retroactive effect, and the defendant’s writ should be denied. As it has been written:
[I]n some cases, the right to interpose a bar to a right of action constitutes in effect a property right which the Legislature may not take away, but at the other extreme are cases where both instinct and reason revolt at the proposition that redress for a wrong must be denied because the legislature may not remove a statutory bar which has conferred an immunity which is contrary to all prevailing ideas of justice.
Robinson v. Robins Dry Dock and Repair Co., 238 N.Y. 271, 274, 144 N.E. 579 (1924).

. Http://www.americanheritage.coin/articles/ web/20060905-natural-disasters.shtml.

. Knabb, Richard D; Rhome, Jamie R.; Brown, Daniel P (December 20, 2005; updated August 10, 2006). "Tropical Cyclone Report: Hurricane Katrina: 23-30 August 2005” (PDF). National Hurricane Center. Http://www.docstoc.c om/docs/2922116/Tropical-Cyclone-Report-Hurricane-KalrinaAu-gust-Richard-D-Knabb-Jamie.

. Knabb, Richard D; Brown, Daniel P.; Rhome, Jamie R. (March 17, 2006; updated August 14, 2006). "Tropical Cyclone Report: Hurricane Rita: 18-26 September 2005” (PDF). National Hurricane Center. Http:// www.nhc.noaa.gov/pdf/TCR-AL182005_Rita. pdf.

. Http://www.americanheritage.com/articles/ web/20060905-natural-disasters.shtml

. Rappaport, Ed (1993). "Hurricane Andrew Preliminary Report.” National Hurricane Center. Http://www.nhc.noaa.gov/l 992 andrew.html.